IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIMOTHY JOSEPH BELTZ, | ) |
| Plaintiff | ) 2:19-cv-1572-NR |
| v. | ) |
| THE UNIVERSITY OF PITTSBURGH, | ) |
| Defendant. | ) |

## OPINION

**J. Nicholas Ranjan, United States District Judge**

Timothy Beltz has sued his former employer, the University of Pittsburgh, claiming that it discriminated against him when it terminated his employment as a Women's Basketball strength and conditioning coach. Mr. Beltz asserts race discrimination claims under both Title VII and 42 U.S.C. § 1981, as well as age discrimination claims under the ADEA and PHRA. Finally, he claims that the University retaliated against him in violation of Title IX. The University counters that it fired Mr. Beltz as part of a routine coaching staff overhaul accompanying a change of head coach. Now, it has moved for summary judgment as to all claims. The Court will grant the motion as to the retaliation claim, but will deny it as to the race discrimination and age discrimination claims.

## BACKGROUND

The material facts here, viewed in the light most favorable to Mr. Beltz, are as follows. Mr. Beltz is a white man. ECF 52-23, 11:25-12-3. He worked for the University of Pittsburgh for nearly 19 years, from August 1999 through his termination in June 2018. ECF 30, ¶ 5. He was 46 years old when he was fired. *See* ECF 52-23, 12:14-16. During his tenure, he worked as a strength coach for a variety of sports. *Id.* at 13:1-14:10. As such, Mr. Beltz characterizes himself as an employee

1

of the Athletic Department rather than any individual team.  *See* ECF 52-37.  After working primarily with the Men's Basketball team from August 2000 to March 2016, Mr. Beltz transitioned to his latest role with the Women's Basketball team when the University hired a new Men's head coach, Kevin Stallings.  ECF 30, ¶¶ 13-14.

Coach Stallings brought on Garry Christopher – a young African American man – as the new Men's Basketball strength and conditioning coach.  ECF 52-24, 8:12-21.  Mr. Beltz and Mr. Christopher shared an office near the weight room the two teams use.  ECF 52-23, 105:14-106:1.  Their relationship was a contentious one, ECF 52-25, 35:17-24, and it came to a head in the autumn 'preseason' of 2016, ECF 52-23, 86:23-88: 8.  Mr. Beltz confronted Mr. Christopher, expressing his frustration that the Men's team was treating the Women's team unfairly – leaving the weight room messy and conducting drills while the women practiced.  *Id*. at 82:2-85:9.  He brought the issue to his supervisor Tony Salesi and senior administrator Jen Toscano.  *Id*. at 88:13-89:13.  Mr. Salesi did not discuss Mr. Beltz's complaints with his supervisors.  ECF 52-25, 67:6-17.  But he did note the conflict in Mr. Beltz's performance review, writing that  "[w]orking relationship with MBBall strength coach remains a challenge despite effort to reach out and communicate with MBBall. A one sided effort from Tim."  ECF 52-9, p. 22, PITT-BELTZ000591.

When Heather Lyke became the University's Athletic Director in March 2017, neither basketball team had a winning record.  ECF 52-23, 206:2-209:1.  In fact, from the period of 2016 to 2018, the Men's team won 37 percent of its games, and the Women's team won 38 percent.  *Id*. at 208:14-17.  Accordingly, Ms. Lyke fired Coach Stallings in March 2018.  ECF 52-5, p. 3.  Shortly thereafter, the Men's Basketball staff also received termination letters.  *Id;* ECF 52-24, 30:14-31:17.  Similarly, Ms. Lyke fired Women's Basketball coach Suzie McConnell-Serio in April 2018.  ECF 52-5, p. 3.  The entire Women's Basketball staff – including Mr. Beltz – also lost their jobs.  ECF 52-19.

Ultimately, the University hired Jeff Capel as the new Men's Basketball coach, ECF 51, ¶ 58, and Lance White as the new Women's coach. *Id.* at ¶ 74. Mr. Christopher was chosen to remain on as the Men's strength coach. ECF 52-6, p. 9. Mr. Beltz, on the other hand, did not receive the job with Coach White. ECF 52-27, 21:2-22:10. Notably, he did not apply for the Men's strength coach position, ECF 52-23, 141:2-5, nor did he express an interest in another strength coaching position elsewhere at the University, *id.* at 138:16-139:3.

## **DISCUSSION & ANALYSIS**

Summary judgment may be granted only if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under governing law," *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (citation omitted), and a dispute is genuine if "there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," *Resch v. Krapf's Coaches, Inc.*, 785 F.3d 869, 871 n.3 (3d Cir. 2015) (citation omitted). Because Mr. Beltz is the non-moving party, the Court must view the evidence in the light most favorable to him, and it must resolve all reasonable inferences in his favor. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Norfolk S. Ry. Co. v. Baseball USA Inc.*, 512 F.3d 86, 91 (3d Cir. 2008). "This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Stewart v. Rutgers, The State Univ.*, 120 F.3d 426, 431 (3d Cir. 1997) (cleaned up).

Because Mr. Beltz relies on indirect proof of discrimination, the *McDonnell Douglas* burden-shifting framework applies when evaluating each claim. 411 U.S. 792 (1973); *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009).[1] Thus, to

---

[1] This standard and the law generally applies to not only the primary federal civil rights claims (Title VII, ADEA, and Title IX claims), but also to the analog Section

3

survive summary judgment, Mr. Beltz must first make out a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If he is successful, the burden of production shifts to the University to articulate a legitimate, non-discriminatory reason for its decisions. *Id.* Finally, the burden returns to Mr. Beltz to show that the University's proffered reason is pretextual. *Id.* at 804. "Although the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

**I.    Mr. Beltz makes out *prima facie* cases of race and age discrimination.**

"The existence of a *prima facie* case of employment discrimination is a question of law that must be decided by the Court." *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797 (3d Cir. 2003). At this stage, a plaintiff must typically show that: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (cleaned up). Establishing a *prima facie* case is "not onerous and poses a burden easily met." *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (cleaned up) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "In particular, making this showing is not as burdensome as succeeding on an ultimate finding of fact as to a discriminatory employment action." *Young v. United Parcel Serv.*, 135 S. Ct. 1338, 1354 (2015) (cleaned up).

---

1981 and PHRA claims. *Stewart*, 120 F.3d at 432; *Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005).

4

**A.     Race claims.**

The University does not dispute that the first three prongs are met here.[2] ECF 51, p. 22.  Instead, it argues that Mr. Beltz has not presented sufficient evidence for a factfinder to infer racial discrimination.  *Id*.  Mr. Beltz can make this showing by "(1) introduc[ing] evidence of comparators (i.e., similarly situated employees who (a) were not members of the same protected class and (b) were treated more favorably under the circumstances); or (2) rely[ing] on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action."  *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014).  But he is "not required to use [the comparator] method, or any particular method, to prove his case."  *Xu Feng v. Univ. of Del.*, 785 F. App'x 53, 55 (3d Cir. 2019).

For his racial discrimination claims, Mr. Beltz opts for the comparator route.  He alleges that Garry Christopher – his counterpart on the Men's Basketball team – was similarly situated but received more favorable treatment.  ECF 45, pp. 3, 8.  Mr. Christopher is black.  ECF 51, ¶ 14.  Mr. Beltz argues that Mr. Christopher is a proper comparator because, like Mr. Beltz, he "served as a Strength Coach for a Basketball team; was accused, like Beltz, of not having the training facility 'recruit ready' [and] found himself in the position of being employed by the Defendant at the same time that the Head Coach of his assigned team was fired."  ECF 55, p. 30.  The University, on the other hand, argues that Mr. Christopher is not a valid comparator because the two men "worked in support of different teams and coaches, operated under different employment conditions (at-will vs. contract), and, even though they were each

---

[2] In "reverse discrimination" cases, like this one, a plaintiff does not need to demonstrate membership in a protected class. *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999).  Rather, all that is needed is "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." *Id.*

terminated by the Athletic Director, their respective terminations were evaluated independently, at different times, and were based on the needs and interests of different basketball programs." ECF 51, p. 23 (emphasis omitted).

When presenting comparator evidence, "[t]he plaintiff has the burden of demonstrating that similarly situated persons were treated differently." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998) (citation omitted). But "[s]imilarly situated does not mean identically situated[.]" *Jackson v. PNC Bank*, No. 15-230, 2016 WL 7324595, *6 (W.D. Pa. Dec. 16, 2016) (Fischer, J) (cleaned up). Rather, "a plaintiff must demonstrate that he is similar to the alleged comparator in relevant respects." *Id.* (cleaned up) This is "a fact-intensive inquiry based on a whole constellation of factors[.]" *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 306 (3d Cir. 2004). "Factors relevant to making the determination include: whether the two employees dealt with the same supervisor, had the same job description, were subject to the same standards, engaged in the same conduct, and the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Ellis v. Bank of NY Mellon Corp.*, No. 18-1549, 2020 WL 2557902, *11 (W.D. Pa. May 20, 2020) (Fischer, J.) (citations omitted). "The central focus… is always whether the employer is treating some people less favorably than others because of their race[.]" *Sarullo*, 352 F.3d at 798 (cleaned up).

Here, the Court finds that there is sufficient evidence for a jury to conclude that Mr. Christopher is a valid comparator. Mr. Beltz and Mr. Christopher had the same job title: Strength and Conditioning Coach. Each worked with basketball players. Each basketball team had a poor record. They shared an office. Mr. Beltz has adduced evidence that they reported to the same supervisor – Tony Salesi. ECF 52-37. And ultimately, they both worked under Athletic Director Heather Lyke. Of course, the two men were not identical in every respect. They worked with different teams under different head coaches. But the plaintiff need not "show that those

whom the employer favored and those whom the employer disfavored were similar in all but the protected ways." *Young*, 135 S. Ct. at 1354 (citations omitted). At bottom, both men performed nearly identical roles in the University's Athletic Department and were evaluated according to the same standard: whether their basketball team performed well.³ Therefore, a reasonable jury could find that Mr. Christopher was similarly situated for comparator purposes.

The University makes two additional arguments against the treatment of Mr. Christopher as a comparator—neither of which is ultimately successful. First, the University argues that Mr. Beltz cannot cherry-pick among equally valid comparators to present a picture of discrimination. ECF 51, p. 37. Indeed, if a "sea of persons [were] treated the same," one aberration would not establish a jury question. *Simpson*, 142 F.3d at 646-47. To that end, the University focuses on other employees who were also terminated alongside the head coaches. *E.g.* ECF 51, p. 14. This argument stops short, because "discrimination against one employee cannot be cured or disproven solely by favorable or equitable treatment of other employees of the same race[.]" *Xu Feng*, 785 F. App'x at 56 (cleaned up). "Whether an employe[r] discriminates only against a subset of a protected class, or discriminates inconsistently, Title VII nevertheless protects any individual so long as that individual is mistreated because of [a protected characteristic]." *Id.* (cleaned up). Because of the job similarities outlined above, Mr. Christopher is the most direct – and therefore the most relevant – comparator for Mr. Beltz.

Second, the University argues that even if Mr. Christopher is similarly situated, he was not in fact treated less favorably than Mr. Beltz was. After all, Mr. Christopher also lost his job when his head coach was fired. ECF 51, pp. 23-24. Like

---

³ The University points to Mr. Christopher's employment contract, differentiating him from Mr. Beltz's at-will status. ECF 51, p. 30. But this is a distinction without a difference; because Mr. Christopher's contract was tied to that of his head coach, he was functionally an at-will employee.

7

Mr. Beltz, he then had "the opportunity to seek the same position with the new head coach." *Id.* at p. 23. But Mr. Christopher was re-hired, whereas Mr. Beltz was not. Technically, Mr. Beltz does not base his racial discrimination claim on failure to re-hire. ECF 52-23, 149:25-151:5. And of course, the University argues that the new head coaches' selections were "post-termination *hiring* decisions – made by different decision-makers to support different basketball programs." ECF 51, p. 24.

But Mr. Beltz alleges that Mr. Christopher's termination was a mere formality and that his ultimate retention was a foregone conclusion; he points to evidence that Mr. Christopher was "'ENCOURAGE[D]' by the University to continue working for the remainder of his contract term," whereas Mr. Beltz "received no such 'ENCOURAGEMENT.'" ECF 55, p. 12 (citing ECF 52-45, pp. 3-4). Further, the University paid for Mr. Christopher to take professional development trips before his contract term expired. ECF 52-46. Thus, Mr. Beltz suggests, actors in the Athletic Department demonstrated favor toward Mr. Christopher and expressed a desire to retain him – independently of Coach Capel's eventual staffing decision.

In short, Mr. Beltz and Mr. Christopher were similarly situated in terms of their employment, but experienced divergent outcomes when coaching leadership changed. Even though some other terminated employees were white, Mr. Christopher – who happens to be black – remained with the Athletics Department. Because Mr. Beltz's *prima facie* burden is light, that's all that's needed for this step.[4]

---

[4] The University mentions that Mr. Beltz's replacement – Rhen Vail – is white, and argues that this fact cuts against an inference of discrimination. ECF 51, p. 2. That may be so, but it is for a jury to weigh. As a matter of law, plaintiffs need not prove that they lost out to a person outside of their class. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 352 (3d Cir. 1999). That's because even if an employer treats some class members favorably, it can still discriminate by treating some employees less favorably because of a protected characteristic. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 272 (3d Cir. 2010). For example, "[a]n employer may fire a woman who makes a single mistake (while retaining men who make numerous smaller mistakes),

**B. Age claims.**

For claims of age discrimination, the *prima facie* prongs are substantially similar. *Dodson v. Coatesville Hosp. Corp.*, 773 F. App'x 78, 80 (3d Cir. 2019). Mr. Beltz is over 40 years old. ECF 52-23, 12:14-16. Again, the University does not dispute that he was qualified for the position he held and that he suffered an adverse employment action. To create an inference of age discrimination, Mr. Beltz must show that he "was replaced by someone sufficiently younger to create an inference of age discrimination." *Lula v. Network Appliance, Inc.*, 245 F. App'x 149, 151 (3d Cir. 2007) (citing *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 234 (3d Cir. 1999). The Third Circuit has held that an eight-year age gap is legally sufficient. *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 699 (3d Cir. 1995). Here, Rhen Vail was approximately 20 years younger than Mr. Beltz. ECF 30, ¶ 33. This is sufficient to meet the light *prima facie* burden.

**II. The University has presented a legitimate, non-discriminatory reason for its decisions.**

Once the plaintiff has stated a *prima facie* case, "the burden is on the Defendants to articulate a legitimate reason" for the decision. *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 262 (3d Cir. 2017). This burden, too, is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). It "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (cleaned up). That is, "[t]he employer need not prove that the tendered reason *actually* motivated its behavior, as throughout the burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes*, 32 F.3d at 763 (emphasis in original) (citation omitted).

---

yet replace her with another woman whom the employer hopes will meet his (higher) expectations for female employees[.]" *Pivirotto*, 191 F.3d at 353-54.

9

Here, the University argues that "[i]n April 2018, after years of underperformance, the Athletic Director, Heather Lyke, terminated the Women's Basketball head coach. Ms. Lyke also decided to terminate all Women's Basketball assistant coaches and sport-specific staff, including Mr. Beltz, because she believed that it was in the best interests of the Women's Basketball program for the new head coach – whoever that was going to be – to build his or her own staff, whether by hiring new staff or retaining current employees." ECF 51, p. 24. As both casual sports fans know and the Third Circuit has recognized, "a shake-up in coaching staff [can] routinely follow[] the hiring of a new head coach." *Paterno v. Pa. State Univ.*, 688 F. App'x 128, 132 (3d Cir. 2017). Mr. Beltz had experienced such a shake-up before; he transitioned from the Men's team to the Women's team because he "'assumed' in 2016 that Coach Stallings would want to bring a new strength and conditioning coach with whom Coach Stallings was comfortable." ECF 51, p. 25 (citing ECF 52-23, 75:22-76:18).

To the extent that Mr. Beltz bases a claim in failure to re-hire, the University argues that it had a legitimate reason for that, too. Lance White, the new Women's Basketball head coach, had the "authority to select his own staff" (ECF 51, p. 24 (citing Lyke Dep., at 47:14-24); Coach White "met with Mr. Beltz and decided *not* to re-hire him, reasoning that the best thing for the Women's Basketball program was a clean break from the prior staff" ECF 51, p. 24-25 (citing ECF 52-27, pp. 21-31)). Again, it is common practice to give new head coaches authority to assemble their team however they choose.

Accordingly, the University has met its burden.

**III. Mr. Beltz has presented enough evidence for a reasonable jury to find that the University's stated reasons were pretextual.**

Finally, the burden returns to Mr. Beltz "to demonstrate by a preponderance of the evidence[] that the defendant's articulated reason for the challenged action is

10

a pretext for unlawful discrimination." *Ellis*, 2020 WL 2557902 at *10 (citations omitted). He must present enough evidence to "allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action[.]" *Doe*, 527 F.3d at 370 (citations omitted). At this point, "[t]he presumption of discrimination established by the *prima facie* showing simply drops out of the picture." *Id.* (cleaned up).

Generally, a plaintiff can show pretext in two ways. First, he can present evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication[.]" *Fuentes*, 32 F.3d at 762. In doing so, he "cannot simply show that the employer's decision was wrong or mistaken… rather, [he] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Ross v. Gilhuly*, 755 F.3d 185, 194 n.13 (3d Cir. 2014) (cleaned up). In short, poking enough holes in an employer's stated reasons can lead a jury reasonably to infer that a nefarious motive really was present.

Second, a plaintiff can show pretext by putting forth evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762. For example, he could show "that the defendant had previously subjected the same plaintiff to unlawful discriminatory treatment, that it had treated other, similarly situated persons not of his protected class more favorably, or that it had discriminated against other members of his protected class or protected categories of

11

persons." *Anderson*, 621 F.3d at 277 (cleaned up).  Mr. Beltz has adduced both types of evidence.

Initially, Mr. Beltz presents evidence undercutting the University's version of events; he argues that neither his firing nor final rejection were as straightforward as the University contends.  The University claims that termination decisions were made as a matter of course and that hiring decisions were the sole purview of the new head coach.  ECF 51, p. 24.  But Mr. Beltz points to evidence that the Athletic Department, under Heather Lyke, had been considering making strength coaching changes the previous year.  ECF 52-41 (May 19, 2017 email from Senior Associate Athletic Director Marcus Bowman, asking for "the salaries of all our strength coaches" and indicating that "[Heather] believes this is the opportunity for us to make some changes in that area").  Another strength coach, Kim King, was terminated in July 2017.  ECF 52-3, p. 8.  Further, Ms. Lyke may have decided to fire Tony Salesi – who supervised strength coaches – in January 2018.  ECF 52-62, p. 3 (January 9, 2018 email from Heather Lyke directing her assistant to "please pull together a list of things we have to use for Tony as we need to make a change at the end of the year").  Thus, staffing changes within the strength and conditioning program were already in the works before any head coach shake-up.

The University also argues that blanket decisions were made to fire all staff members.  But Mr. Beltz has adduced evidence that he was personally targeted.  As of March 27, 2018 at 10:24 a.m., the "final version" of the transition outline listed Mr. Beltz as a member of support staff, not a candidate for termination.  ECF 52-48, p. 2.  But by 6:45 p.m. that same day, Mr. Beltz's name had moved to the termination list.  ECF 52-49, p. 1.  In her deposition, Ms. Lyke could not explain this change.  ECF 52-31, 65:20-23.  Bethany Wagner, the administrator who prepared the document, testified that she did not recall discussions that took place between drafts.  ECF 52-29, 14:18-20:18.  And, in his deposition, Chris Hoppe indicated that he did not know

the details either. ECF 52-26, 118:24-119:12; 122:23-123:3. More broadly, the University did not specifically answer what person(s) ultimately participated in the decision to fire Mr. Beltz. *See* ECF 52-3, pp. 3-4. Of course, gaps in recollection may be due to the passage of time. But "[a]n inference of pretext may arise if the plaintiff can raise suspicions with respect to the defendant's credibility[.]" *Bray v. Marriott Hotels*, 110 F.3d 986, 990 (3d Cir. 1997) (citation omitted). And "a key decision maker's lack of recollection," including the "inability to identify precisely who terminated Plaintiff[,] supports denying Defendant's summary judgment motion." *Roehrig v. W.G. Tomko, Inc.*, No. 15-146, 2016 WL 2755177, *3-4 (W.D. Pa. May 12, 2016) (Fischer, J).

Mr. Beltz has also presented the second type of evidence to establish pretext — *i.e.*, evidence tending to show that discrimination played a role in the University's decisions. For example, Tony Salesi perceived that the Department was "not looking for someone who is at the end of their career, essentially," and wanted "people on their way up in the profession." ECF 52-25, 110:25-112:19. Additionally, Tyler Carpenter – the Director of Sports Performance – opined that Mr. Beltz did not have sufficient "energy" for the position. ECF 52-30, 61:20-65:5 ("I am all about big, big energy. And at any passing time that I would ever walk past that weight room, energy was, like, not at all oozing out of that room…. [L]ike sensing, like, energy, vampire feel….He was, like, taking energy out of me."). A jury could find that this comment regarding a lack of energy references older age. *E.g.*, *Finch v. Hercules, Inc.*, 865 F. Supp. 1104, 1112-13 (D. Del. 1994) (denying summary judgment where CEO had stated that "younger people have perhaps more energy and a longer period of time in which they can perform their duties"). The University concedes that Mr. Carpenter recommended candidates to Coach White during the interview process. ECF 52-16. Thus, a jury could conclude that he was a decisionmaker whose

13

comments carry weight. *See Roebuck v. Drexel Univ.*, 852 F.2d 715, 733 (3d Cir. 1988).

The University disputes Mr. Beltz's assertions and maintains that its proffered rationale was the real one. But at the summary judgment stage, it is not for the Court to make credibility determinations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). It is also "not the court's role to weigh the disputed evidence and decide which is more probative." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995) (citation omitted). Instead, "[t]he benefit of the doubt is to be given to allegations of the non-moving party when in conflict with the moving party's claims." *Ellis*, 2020 WL 2557902 at *9 (citing *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011)). Mr. Beltz has presented more than a mere scintilla of evidence pointing to pretext, and a reasonable jury could find that the University's proffered reasons were not true. *See Liberty Lobby*, 477 U.S. at 252; *Burton*, 707 F.3d at 425. Therefore, the discrimination claims survive summary judgment.

## IV.   Mr. Beltz's Title IX retaliation claim fails.

Mr. Beltz also claims that the University fired him partly because of his complaints about unfair treatment of the Women's Basketball team; he alleges that the University impermissibly retaliated against him in violation of Title IX. The Court will grant summary judgment for the University as to this claim.

As above, a plaintiff claiming retaliation must first state a *prima facie* case. He "must show that (1) []he engaged in protected activity, (2) []he suffered an adverse employment action, and (3) there was a causal connection between the participation in the protected activity and the adverse action." *Carvalho-Grevious* 851 F.3d at 257 (citation omitted). Plaintiff has not done so.[5]

---

[5] While the parties dispute whether Mr. Beltz's complaints about Mr. Christopher and the condition of the weight room amounted to "protected activity," the issue is not dispositive. So, the Court will assume that it did. There is also no dispute that Mr. Beltz experienced an adverse employment action.

14

Causation is the critical issue here. "[A]t the prima facie stage, the plaintiff must produce evidence sufficient to raise the inference that [his] protected activity was the *likely reason* for the adverse employment action." *Carvalho-Grevious*, 851 F.3d at 259 (cleaned up). The Court must examine the proffered evidence as a whole. *Id.* at 260. Common ways to suggest a causal link include "proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity unusually suggestive of a retaliatory motive." *Id.* (cleaned up).

To begin with, Mr. Beltz has not shown unduly suggestive temporal proximity in this case. The University did not terminate him until nearly two years after his complaints. "There is no bright line rule as to what constitutes unduly suggestive temporal proximity[.]" *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (cleaned up). But the Third Circuit has held that a gap of as little as "three months…without more, cannot create an inference of causation and defeat summary judgment." *Id.* Where the gap has been longer, courts have required other evidence, such as an intervening pattern of antagonism, to link the protective activity with the adverse employment action. *Kachmar v. SunGard Data Systs., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

The Court finds that Mr. Beltz has not established sufficient evidence of an intervening pattern of antagonism for the relevant time period. The parties do not dispute that Mr. Beltz and Mr. Christopher did not get along. Mr. Beltz alleges that the University took no action regarding his complaints about Mr. Christopher's behavior. ECF 55, p. 8. Instead, Mr. Beltz asserts that a superior told him "you need to clean up after [Mr. Christopher]." ECF 52-23, 141:17-142:2. Also, Mr. Beltz's 2017 performance review indicated "Development Needed" in the area of interpersonal communication. ECF 52-9, pp. 21-22. Finally, neither man received their full raise that year. ECF 52-1, p. 3; ECF 52-32. But the review and sub-maximal raise are not

challenged as the adverse employment actions; his termination is what's at issue. *See* ECF 55, p. 34. So, anything that happened between the complaints and the review is beside the point.

Importantly, Mr. Beltz has not presented any evidence of retaliatory mistreatment in the time between his performance review and his termination, which occurred nearly a year after the review and almost two years after he first complained to Tony Salesi. Mr. Beltz suggests that the University was simply biding its time until the opportunity to retaliate presented itself. ECF 55, p. 34. But many months of silence does not indicate a pattern of antagonism. *See, e.g.*, *Robinson v. SEPTA*, 982 F.2d 892, 895 (3d Cir. 1997) (pattern of antagonism existed where, over approximately two years, defendant subjected plaintiff to a "constant barrage of written warnings, inaccurate point totalings, and disciplinary action"); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997) (finding pattern of antagonism where over a two year period the defendant "set [plaintiff] up to fail" at his job, "fail[ed] to respond appropriately to racist graffiti in its plant," and terminated him "pursuant to a 'sham' ranking process").

Taken as a whole, the record does not lead to an inference of causation between Mr. Beltz's complaints and his termination. "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *NAACP v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Summary judgment must therefore be granted as to this claim.

## CONCLUSION

For the foregoing reasons, the University's motion for summary judgment is **DENIED** in part and **GRANTED** in part. An appropriate order follows.

DATE: December 15, 2021                               BY THE COURT:

                                                     /s/ *J. Nicholas Ranjan*
                                                     United States District Judge